UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW JOHN HAUGAN,<br><br>Plaintiff,<br><br>vs.<br><br>ANGEL LUIS PADILLA, SERGEANT AT SDSP; INDIVIDUAL AND OFFICIAL CAPACITY;<br><br>Defendant. | 4:24-CV-04133-RAL<br><br><br>OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND APPOINTING PLAINTIFF COUNSEL |

Plaintiff Matthew John Haugan, an inmate at the South Dakota State Penitentiary (SDSP), filed a pro se civil rights lawsuit under 28 U.S.C. § 1983. Doc. 1. This Court granted Haugan's motion for leave to proceed in forma pauperis and screened Haugan's complaint under 28 U.S.C. § 1915A. Doc. 8. Haugan's Eighth Amendment claim against defendant Angel Luis Padilla, in his individual capacity, survived § 1915A screening, and this Court ordered service on Padilla. Id. at 7, 9–10. Haugan alleged that while incarcerated, he had been sexually assaulted by Padilla, a correctional officer employed by the South Dakota Department of Corrections, in violation of the Eighth Amendment. Doc. 1.

Padilla was answered the complaint and deposed Haugan. Docs. 20, 22. Padilla on February 13, 2026, filed a Motion for Summary Judgment, Memorandum in Support of Motion for Summary Judgment, Statement of Undisputed Material Facts, and Affidavit attaching excerpts of Haugan's deposition. Docs. 35, 36, 37, 38. After Haugan did not respond to the Motion for

1

Summary Judgment despite this Court directing him to do so, Doc. 39, this Court later ordered Haugan to file a statement on "whether he opposes entry of summary judgment and whether he intends to continue to litigate the case," Doc. 40. Haugan wrote that he "very much [] wish[ed] to proceed with the case," and that his silence was due to his misunderstanding about his need to respond. Doc. 41. For the reasons discussed below, this Court denies summary judgment to Padilla and appoints counsel for Haugan.

I.      **Facts**

A. **Sources for the Facts**

The facts before this Court include those listed in Haugan's pleadings filed under the penalty of perjury, Docs. 1, 1-1,[1] and the excerpts of the transcript from Haugan's deposition, Doc. 37-1, used to support the statement of undisputed material facts filed by Padilla, Doc. 37. For the purposes of his summary judgment motion, Padilla accepts as true the facts as they are alleged by Haugan in his pleadings and his deposition but reserves the right to present different facts at trial. Doc. 37 at 1 n.1 (citing Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001)). Haugan did not respond to the moving party's statement of undisputed materials facts despite an order informing him of the ramifications of not doing so. Doc. 39. "All material facts set forth in [Defendant's] statement of material facts [are] deemed to be admitted" under this Court's Civil Local Rule 56.1.D

_____

[1] "[T]he facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion." Roberson v. Hayti Police Dep't, 241 F.3d 992, 995 (8th Cir. 2001). See also Lopez v. Cnty. of Phelps, No. 4:03-CV-1598, 2006 WL 288090, at *1 (E.D. Mo. Feb. 7, 2006) ("Here, plaintiff's complaint was verified, and allegations made in pro se litigants' verified pleadings are properly treated as satisfying affidavit requirements." (citing Hartsfield v. Colburn, 371 F.3d 454, 456 (8th Cir. 2004) (citing 28 U.S.C. § 1746))).

2

as a result. See D.S.D. Civ. LR 56.1(D); Fed. R. Civ. P. 56(e); Thompson v. Dakota S. Ry. Co., No. 3:17-CV-03028, 2019 WL 5558378, at *1 (D.S.D. Oct. 28, 2019).

Haugan, who is not law-trained, wrote that he agrees with the Defendant's motion for summary judgment but then elaborated on his desire to continue prosecuting the case. Doc. 41. Liberally construing this filing, this Court understands that Haugan is opposing Padilla's motion for summary judgment but not contesting Padilla's Statement of Undisputed Material Facts. See Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004). Indeed, within this response, Haugan only quibbles with whether his sexual relationship with Padilla was consensual in light of Padilla's "deception, lies, and promises." Doc. 41 at 1–2.[2] Haugan's deposition testimony undermines the suggestion that the sexual relationship was entirely consensual. See Doc. 37-1. So, despite Padilla's Statement of Undisputed Material Facts being taken as true under D.S.D. Civ. LR 56.1(D), a fact question remains on whether the sexual relationship was entirely consensual.

**B. The Relationship Between the Parties**

Haugan was incarcerated at SDSP between at least May 9, 2021, and March 7, 2023. Doc. 37 ¶ 1 (citing Doc. 1 at 4). During that time, SDSP employed Padilla as a sergeant. Id. ¶ 2 (citing Doc. 1 at 4).

In spring of 2021, Haugan was incarcerated on the administrative segregation floor because "of self-harm issues." Doc. 1 at 4; Doc. 37-1 at 3. In administrative segregation, an incarcerated person is "isolated" and spends "23 hours a day in [his] cell, one [hour] out." Doc. 37-1 at 1. Excerpting of Haugan's deposition transcript leaves the record unclear about how long Haugan

---

[2] Haugan writes: "Mr. Padilla's blatant deception, lies, and promises led into any act being deemed as 'consensual' as abuse in my eyes as I would never have engaged with the Defendant sexually or any other manner if I was aware of his plans to lie and manipulate me at work and then walk out and disappear upon my parole." Doc. 41 at 1–2.

3

had been in administrative segregation, though Haugan testified to being in administrative segregation for "about two years straight." Id. In administrative segregation Section 1 housing, an inmate has an officer assist him everywhere he goes, such as to the showers. Id. at 4.

Padilla first met Haugan while Haugan was incarcerated in administrative segregation Section 1 housing, and Padilla was responsible for patrolling that floor. Doc. 37 ¶ 3 (citing Doc. 37-1 at 1); Doc. 37-1 at 4. Padilla and Haugan did not know each other before Haugan was incarcerated. Doc. 37-1 at 4–5. Shortly before they met, around Easter, Haugan had experienced a manic episode and shaved his head. Id. at 4. At first, Padilla stopped to talk to Haugan in his administrative segregation cell. Id. at 2. Haugan remembered that he "borrowed a pen from" Padilla. Id. Haugan then testified, "I remember one day I broke a phone off the wall[] in Section 1 and gave him the wires to it because I was going to keep them in my cell." Id.

After one or two months of talking to Haugan in his cell, on May 9, 2021, Padilla "came up to [Haugan's] cell a couple of times that night, asking to see [Haugan] naked or whatever." Id. Haugan testified that he "felt a little put off by it" and "throughout the night I just got a little more uncomfortable, uncomfortable." Id. Haugan detailed:

> May 9th, he just kept asking – I was in a gown, I think, in my room. He kept asking to see me naked and, I told him no a couple of times. He kept coming by my cell, kept talking to me, and I mean, I'm in a 7 by 12 box. I can't get away from somebody.

Id. at 10. Haugan testified that he did not want to comply with the request. Id. at 12 ("I don't exactly know how you're coming at this conversation, but like I've said multiple times, he asked me two or three different times to see me like that, and I didn't feel like I wanted to do it. And eventually I complied. I fell under the pressure of it."). Haugan testified, "I ended up complying with him, just because I didn't know what this guy was on." Id. at 2–3. After Haugan took off his

gown to allow Padilla to see him naked in his administrative segregation cell, Padilla said, "[T]his is how you make me feel," and "he outlined his hard penis in his pants." Id. at 12.

After two weeks, during which Haugan testified Padilla was "being decent," Padilla "took my hand and put it on his penis over his pants." Id. at 3. "After the May 9, 2021, disrobing, Padilla would cuff Haugan through his cuff port and transport Haugan throughout the prison[, and] [w]hile doing so, Padilla would place Haugan's hand outside of his pants and over his penis." Doc. 37 ¶ 11 (citing Doc. 37-1). Padilla would have Haugan "touch his penis over his pants through the cuff port at [his] cell front or when [Haugan] was moved to the showers." Doc. 1 at 4. Padilla would "come pick [Haugan] up and he would be able to take [Haugan] by himself" to the showers. Doc. 37-1 at 4. Haugan testified that when he was in the showers, "you couldn't see from the camera if [Padilla's] body was in between me, what was happening." Id. at 3. Padilla continued to do this to Haugan until Haugan was released from administrative segregation. Doc. 1 at 4. Haugan testified that "[t]he same thing would occur maybe 10 – 10, 15 times probably before I got out of that section [Section 1]." Id.

Haugan testified that Padilla continued to talk to him following his release from administrative segregation and that they had sexual conversations. Id. at 14–15. Padilla included in his Statement of Undisputed Material Facts, "Haugan and Padilla interacted, began spending time together and developed a fluent pattern of communication which included conversations when Padilla would stop at Haugan's cell; Haugan began to care a lot of about Padilla." Doc. 37 ¶ 4 (citing Doc. 37-1 at 4–5). But see Doc. 37-1 at 19 ("Q: So you never got in deep conversations? A: Not really. No."). Padilla also included that the two would discuss various topics together, "Padilla would give Haugan food that Padilla's wife made, give Haugan energy drinks, and would allow Haugan to smoke his 'vape.'" Doc. 37 ¶¶ 5–6 (citing Doc. 37-1 at 19, 28–29). Padilla

5

further included, "At the time of his incarceration, Haugan saw what he had with Padilla as a relationship." Id. ¶ 9 (citing Doc. 37-1 at 7).

In April 2022, Haugan was assigned to work in laundry. Doc. 1 at 4. On April 30, Padilla "came into the laundry" when no one else was around, took Haugan to "a cage back there where they have clothing," "and proceeded to put his mouth on [Haugan's] penis." Doc. 37-1 at 11, 14; Doc. 1 at 4. Padilla had Haugan "stand on the rack of clothes . . . [s]o he didn't have to get down." Doc. 37-1 at 16. Padilla then performed oral sex on Haugan for "30, 40 seconds." Id. at 17. During Haugan's deposition, Padilla's counsel asked if Haugan received sexual gratification from the act, to which Haugan replied, "I'm sure. But, again, along the lines of bad information." Id. at 19. Haugan added that Padilla "had an inversion to bodily fluids" and that "[t]hey're dangerous, you can be prosecuted through them." Id. at 17. Haugan testified that Padilla never wanted to get to the point of "[b]odily emissions." Id. Although they talked briefly afterwards for two minutes, Haugan testified that the two never really got into deep conversations. Id. at 18–19.

On July 16, 2022, when Haugan was assigned to work as a hallway orderly, "Padilla came in the staff bathroom with [Haugan] when [Haugan] was cleaning and had [Haugan] place [Padilla's] penis in [Haugan's] mouth." Doc. 1 at 4. Haugan testified that he had "gone on a trash run with [Padilla], and then, [Padilla] had [Haugan] go in" the little shower area that is in the back of the staff bathroom. Doc. 37-1 at 20. "[I]t was [Padilla's] idea to go in there afterwards that time . . . . [r]ight after that trash run." Id. Padilla asked Haugan if he had cleaned the bathroom already, and when Haugan replied that he had, Padilla said that they would go in there anyway. Id. at 21–22. There were no cameras in the staff bathrooms. Id. Padilla unzipped his pants, pulled

6

his penis out, and had Haugan perform oral sex on him for twenty to thirty seconds before he was about to ejaculate. Id. at 22–23.

Haugan wrote in his pleadings, "There were countless other occurrences of him taking me in the staff bathroom and touching on my body (penis, buttocks) and having me do the same to him." Doc. 1 at 4. Haugan later testified, that while he was assigned to clean, Padilla would "start making out with [him] or touching [his] butt or groping [him] over the clothing." Doc. 37-1 at 13.

The Statement of Undisputed Material Facts establishes that Haugan saw what he had with Padilla "as a relationship," and that the two "confessed their love to one another," and "became each other's emotional support." Doc. 37 ¶¶ 7–9 (citing Doc. 37-1 at 7). "Haugan and Padilla bonded and Haugan believed the two were in a relationship while he was incarcerated and the two planned for a relationship after Haugan's release from prison," and "[d]uring the period he believed to be in a relationship with Padilla, Haugan wrote Padilla love letters, gifted Padilla a ring, and told Padilla he loved him." Id. ¶¶ 16–17 (citing Doc. 37-1 at 6–8, 9–10, 25, 28).

Haugan did not contest a part of the Statement of Undisputed Material Facts that read: "Throughout their sexual encounters, Padilla never forced Haugan to engage in any sexual acts nor made any threats toward Haugan." Id. ¶ 15 (citing Doc. 37-1 at 24). However, Haugan testified during his deposition:

> Q: Right. In all these sexual encounters, did he ever force you to do anything?
> A: I wouldn't say force.
> Q: Did he ever make any threats toward you to do any of this?
> A: No.
> Q: I mean, at the time, was it consensual with you?
> A: I don't think it was ever consensual.

Doc. 37-1 at 24.

Haugan's original pleading claimed that the sexual encounters described in the pleading were incidents of sexual assault and listed his injuries as "mental and emotional distress, PTSD

[post-traumatic stress disorder,] physical & sexual abuse." Doc. 1 at 4. He alleged in a grievance attached to the pleading that Padilla mentally abused him by leading Haugan to believe that they were in a relationship. Doc. 1-1 at 2, 4. Throughout his deposition testimony, Haugan repeated that Padilla lied to him, engaged in "complete manipulation," and at one point said Padilla was "no different . . . than one of these . . . guys with one of their child molestation charges to try to prey on young kids in here [SDSP]." Doc. 37-1 at 5–6. Haugan testified, "[I]t was just something fun for him to play around with me at work. I'm -- I'm not a sex toy," and "I think he thought I was a f[***]ing idiot." Id. at 8.

"Haugan never filed a kite (written complaint) with prison administration regarding the sexual encounters with Padilla while incarcerated." Doc. 37 ¶ 18 (citing Doc. 37-1 at 26–27). Haugan eventually reported the incident to the police, and on March 12, 2023, Haugan filed a PREA claim about Padilla's actions. See Doc. 37-1 at 26–27; Doc. 1-1 at 1. On November 21, 2023, Lieutenant Wynia, who did the PREA investigation determination, informed Haugan in writing that his sexual assault allegation made on March 12, 2023 was found to be "Substantiated," meaning that there was "evidence or information that the allegation did happen." Doc. 1-1 at 1 (emphasis omitted). On April 22, 2024, Warden Teresa Bittinger wrote and signed an administrative remedy response to Haugan on his PREA complaint, which read in part, "Regarding the incident in question, it has been thoroughly investigated and substantiated." Id. at 3. Although the case was referred to the Attorney General's office by the South Dakota Department of Corrections, the Attorney General's office declined the case. Id. at 5. Padilla now moves for summary judgment.

8

## II.    Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." On summary judgment, courts view "the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012) (quoting Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011)). The burden is on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A material fact is one that might affect the outcome of the case." Bruhn Farms Joint Venture v. Fireman's Fund Inc. Co., 823 F.3d 1161, 1165 (8th Cir. 2016) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Gibson v. Am. Greetings Corp., 670 F.3d 844 (8th Cir. 2012) (quoting Anderson, 477 U.S. at 252).

"If opposing parties tell two different stories, the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party—as long as those facts are not so blatantly contradicted by the record . . . that no reasonable jury could believe them." Reed v. City of St. Charles, Mo., 561 F.3d 788, 790 (8th Cir. 2009) (cleaned up and citation omitted). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "If a party fails . . . to properly address another

9

party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## III.    Discussion

### A. Eighth Amendment Claim

Haugan has brought an Eighth Amendment claim against Padilla for sexually assaulting him while Haugan was in custody and Padilla was a correctional officer assigned to supervise Haugan. Doc. 1. Padilla moves for summary judgment on the sole ground that "Haugan's allegations of sexual assault against Padilla result from a consensual relationship between Haugan and Padilla." Doc. 36 at 1. Padilla requests that this Court "find that Haugan and Padilla engaged in a consensual relationship involving sexual acts that, while inappropriate, cannot as a matter of law constitute pain under the Eighth Amendment and bar Haugan from recovery." Id. at 2. Haugan, who is proceeding pro se, did not file a formal response to the motion but did assert that he wishes to continue to prosecute the case, which this Court has liberally construed as opposing the motion for summary judgment. See Doc. 41; Stone, 364 F.3d at 914.

"The question of whether the [E]ighth [A]mendment has been violated is a mixed question of fact and law." Porth v. Farrier, 934 F.2d 154, 156 (8th Cir. 1991). "As a general matter, once a prisoner is incarcerated, 'only the "unnecessary and wanton infliction of pain" . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" Richardson v. Duncan, 117 F.4th 1025, 1028 (8th Cir. 2024), cert. denied, 146 S. Ct. 295 (2025) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). The Eighth Circuit has recognized that "[s]exual activity between a correctional officer and an inmate is improper and serves no legitimate penological purpose." Id. at 1029. "To prevail on a constitutional claim of sexual harassment, an inmate must [] prove, as

10

an objective matter, that the alleged abuse or harassment caused 'pain' and, as a subjective matter, that the officer in question acted with a sufficiently culpable state of mind." Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir. 1997).

The objective prong requires that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Richardson, 117 F.4th at 1028 (citation omitted). For this inquiry, the court "analyze[s] the general requirement of infliction of pain with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." Id. at 1029 (cleaned up and citation omitted). In Freitas, a case decided before Congress passed the Prison Rape Elimination Act (PREA), the Eighth Circuit held "welcome and voluntary sexual interactions, no matter how inappropriate, cannot as matter of law constitute 'pain' as contemplated by the Eighth Amendment." 109 F.3d at 1339. Therefore, because "where a prisoner consents to sexual encounters, there is no infliction of 'pain' as contemplated by the Eighth Amendment[,] . . . the prisoner in that case could not satisfy the objective component of a claim alleging cruel and unusual punishment." Richardson, 117 F.4th at 1029 (summarizing conclusion in Freitas, 109 F.3d 1335).

Revisiting the holding in Freitas twenty-seven years later, the Eighth Circuit in Richardson noted it "has accepted that sexual interactions nonetheless could be 'welcome and voluntary,' and thus rejected a *per se* rule that prisoners are incapable of voluntary consent." Richardson, 117 F.4th at 1030 (citing Freitas, 103 F.3d at 1339). In Richardson, the Eighth Circuit affirmed a district court's dismissal of an incarcerated plaintiff's complaint alleging an Eighth Amendment violation for sexual assault by a guard because "[t]o state a plausible constitutional claim, [] a prisoner who recounts sexual contact that is outwardly consensual must allege at least some manifestation of resistance by the prisoner or some act of coercion by the corrections official." Id.

11

at 1030. For example, the Eighth Circuit has found that a plaintiff has "sufficiently state[d] an Eighth Amendment claim by alleging that [the guard] forcibly ground his pelvis against her, grabbed her breast, verbally demanded sexual favors, made physical sexual advances, and attempted to force himself upon her." Williams v. Prudden, 67 F. App'x 976, 977 (8th Cir. 2003) (per curiam) (unpublished).

The Eighth Circuit noted in Richardson that sexual activity between a correctional officer and an incarcerated person is a felony in Arkansas, see 117 F.4th at 1029; it is also prohibited and punishable as a felony in South Dakota, SDCL § 24-1-26.1. Further, under South Dakota DOC Policy 1100-01, entitled "Prison Rape Elimination Act (PREA),"

> [e]mployees, contract workers, and volunteers may not knowingly maintain social, emotional, or sexual associations with current offenders, former offenders, or the family and of friends of offenders. Any person employed by the state, or any person employed with any state prison who knowingly engages in an act of sexual penetration with an offender who is under the custodial, supervisory, or disciplinary authority of the person may be guilty of a Class 6 felony and in violation of DOC policy 100-05 – Staff Code of Ethics and SDCL § 24-1-26.1.

Prison Rape Elimination Act (PREA), S.D. Dep't of Corr., 5 (Oct. 1, 2025), https://www.doc.sd.gov/home/showpublisheddocument/1198/638961129259870000. In line with PREA, which sought to establish a "zero-tolerance policy" on prison rape, the South Dakota DOC policy states: "There is no 'consensual sex' in a custodial setting or supervisory relationship." Id.; see 34 U.S.C. § 30302 (listing purposes of PREA); 34 U.S.C. § 30301(2) (estimating the number of people who had been sexually assaulted in prison during the twenty years before the passage of PREA to exceed one million people).[3] But "violation of an internal prison regulation does not by

---

[3] "Insufficient research has been conducted and insufficient data reported on the extent of prison rape. However, experts have conservatively estimated that at least 13 percent of the inmates in the United States have been sexually assaulted in prison. Many inmates have suffered repeated assaults. Under this estimate, nearly 200,000 inmates now incarcerated have been or will be the

12

itself give rise to an Eighth Amendment claim." Newman v. Holmes, 122 F.3d 650, 653 (8th Cir. 1997).

Haugan alleged a sufficient Eighth Amendment claim against Padilla in his individual capacity for sexual assault to survive 28 U.S.C. § 1915A screening, and the question now before this Court is whether there is a genuine dispute of material fact about Haugan's consent precluding an entry of summary judgment in favor of Padilla. Doc. 8 at 7; Doc. 36. Padilla argues that he is entitled to summary judgment because the verified pleading and Haugan's deposition testimony, as summarized in the undisputed statement of material facts, show that Haugan consented to the

---

victims of prison rape. The total number of inmates who have been sexually assaulted in the past 20 years likely exceeds 1,000,000." 34 U.S.C. § 30301(2).

A May 2026 Government Accountability Office (GAO) report reviewing the efficacy of PREA in the federal Bureau of Prisons (BOP) recently concluded "sexual abuse—such as that which occurred at BOP's FCI Dublin and FCC Coleman facilities—remains a significant problem in the federal prison system 23 years after the enactment of PREA." Federal Prisons: Improvements Needed to Prevent, Detect, and Address Sexual Abuse, GAO (May 5, 2026), https://files.gao.gov/reports/GAO-26-107343/index.html?_gl=1*dai5vn*_ga*MTkyNTc4MTUzMy4xNzc4NTk4OTAy*_ga_V393SN S3SR*czE3ODI3NDI3MjQkbzMkZzAkdDE3ODI3NDI3MjQkajYwJGwwJGgw. The GAO highlighted examples of substantiated sexual abuse allegations, such as one where "[t]he abuse occurred in program service areas (e.g., kitchen, storage, laundry) and staff-only areas." Id. Cf. Meredith B. Esser, Who Bears the Burden When Prison Guards Rape?, 109 Iowa L. Rev. Online 188, 191–94 (2024) (reviewing the Senate Permanent Subcommittee on Investigation's report on sexual abuse of women in federal prisons and summarizing incidents of sexual abuse at FCC Coleman and FCI Dublin, including that "[w]omen were terrorized throughout the prison, including in the kitchen, the security office, chapel, medical office, at work, and in their cells"); 197–98 (reviewing how the FCI Dublin Warden groomed one incarcerated woman for abuse by "saying vulgar and sexually explicit things to her, forcing her to pose for him naked, showing her pictures of his penis, and perpetrating hands-on sexual abuse" (footnotes omitted)).

13

sexual acts that Padilla either performed on Haugan or requested that Haugan perform on him while Haugan was incarcerated and Padilla was a correctional officer. Doc. 36.

Richardson does not provide this Court with a definition of "consent" beyond requiring a showing of an absence of consent at the pleadings stage, which, when an inmate alleges what appears to be "outwardly consensual" behavior, means "at least some manifestation of resistance by the prisoner or some act of coercion by the corrections official." 117 F.4th at 1030.[4] In Freitas, where the Eighth Circuit affirmed the trial court's finding after a bench trial that the sexual encounters between the incarcerated plaintiff and the correctional employee were consensual and therefore not an Eighth Amendment violation, the decision reviewed the incarcerated plaintiff's description of his interactions with the correctional employee and noted they had both perpetuated it. 109 F.3d at 1337–39. The Eighth Circuit reasoned "there is not much evidence suggesting that [the correctional employee] put [the incarcerated plaintiff] in a 'no-win' situation, and more to the point, there is ample evidence supporting the trial court's finding that their relationship was consensual in the freest sense of the word." Id. at 1339. However, the panel added the caveat that

---

[4] The Eighth Circuit has upheld denials of summary judgment in other cases where there were "allegations that prison guard conducted daily strip searches, made sexual comments about prisoner's penis and buttocks, and rubbed prisoner's buttocks with [a] nightstick," as these allegations "were sufficient to withstand motion for summary judgment in inmate's suit for sexual assault in violation of Fourth and Fourteenth Amendments," and where "allegations in verified complaint" claiming unconstitutional searches reviewed "that prison guard performed almost daily pat-down searches, tickled inmates, and deliberately examined genital, anus, lower stomach." Williams, 67 F. App'x at 977 (first summarizing Seltzer–Bey v. Delo, 66 F.3d 961, 962–63 (8th Cir. 1995)), then summarizing Watson v. Jones, 980 F.2d 1165, 1165–66 (8th Cir. 1992)). Further, in a recent case concerning a pretrial detainee's claim of a Fourteenth Amendment violation for sexual harassment and abuse during a strip search, where the Eighth Circuit affirmed the denial of the guard's motion for summary judgment, the panel reviewed that "'sexual fondling and touching' of an unclothed 'private erogenous area' can be sexual assault in violation of the substantive due process right to bodily integrity." Glover v. Paul, 78 F.4th 1019, 1022 (8th Cir. 2023) (quoting Haberthur v. City of Raymore, 119 F.3d 720, 723–24 (8th Cir. 1997)). However, the allegations in these cases did not include information that raised questions about whether the sexual conduct was consensual, so they are of limited utility to this Court.

14

it was not "deciding at what point unwelcome sexual advance become serious enough to constitute 'pain.'" Id.

In the District of South Dakota, a defendant guard's motion for summary judgment on the plaintiff's Eighth Amendment sexual assault claim was denied where the plaintiff had alleged the sexual assault occurred while he was on work release. Caskey v. S.D. State Penitentiary, No. 4:14-CV-04010-KES, 2015 WL 7345763 (D.S.D. Sept. 29, 2015), report and recommendation adopted, 2015 WL 7306432 (D.S.D. Nov. 19, 2015). The plaintiff alleged in his amended complaint that he left the prison during the day for work and sometimes went to his friend's house and used his computer. Id. at *3. The plaintiff originally met the guard on a dating website, where neither party knew who the other was. Id. When the plaintiff realized the other man was a guard, he said that they could not meet because he was on work release and the guard should not come to the apartment, but the guard came to the friend's apartment anyway. Id. at *3–4. The two men

> went to a bedroom in the apartment and engaged in fellatio. Mr. Caskey was not aroused because he was frightened knowing Lauseng was a captain at the DOC. Nevertheless, Mr. Caskey did not protest nor attempt to push Mr. Lauseng away. After the encounter, Mr. Lauseng told Mr. Caskey not to tell anyone, because he (Lauseng) had a lot of power at the SDSP. Mr. Lauseng never physically harmed Mr. Caskey, nor did he write him up for any violations at the SDSP after the sexual encounter. At a date unknown to Mr. Caskey, Mr. Lauseng resigned his position at the SDSP. When Mr. Caskey learned of Captain Lauseng's resignation, he notified Major Crystal Van Vooren (Special Security) of the June 2013 sexual encounter.

Id. at *4 (citations omitted). Although the defendant guard "assert[ed] his actions [on summary judgment] were not taken under color of state law because he never threatened to use his position as a correctional officer, and Mr. Caskey participated in the sex act voluntarily," the magistrate judge concluded that "[n]either of those assertions, however, are sufficiently clear on this record to warrant summary judgment in [his] favor," a conclusion which was subsequently adopted by the district court. Id. at *20. The magistrate judge highlighted the plaintiff's deposition testimony,

including that the plaintiff "testified that while he did not physically fight Mr. Lauseng, he asked Mr. Lauseng not to come to the apartment after he revealed his prisoner status, but Mr. Lauseng came anyway," and that he "engaged in the sex act only because of his fear of Mr. Lauseng's position at the DOC, and Mr. Lauseng threatened Mr. Caskey with his power as a DOC official in an effort to keep Mr. Caskey silent." Id. at *22.

In Rogers v. City of Little Rock, 152 F.3d 790 (8th Cir. 1998), the plaintiff brought a § 1983 action against a police officer alleging he had violated her constitutional rights when he raped her while he was on duty (among other claims). 152 F.3d at 793. This plaintiff's claim was based on her substantive due process rights and did not allege an Eighth Amendment violation. But informatively, in that case, the district court denied the police officer's "motion for summary judgment in his individual capacity . . . on the basis that a genuine issue of material fact remained about whether the sex was consensual." Id. at 794, 797. Following testimony from both parties at trial, the court "made findings that [the plaintiff] was afraid of [the defendant police officer] and what might happen if she didn't cooperate with a police officer and that he coerced her into sexual intercourse." Id. at 794. Later on appeal, the police officer argued in part that "[the plaintiff] failed to establish that he violated her due process rights since the evidence at trial showed the sex was consensual," and "also note[d] that the Internal Affairs Division of the Little Rock Police Department (LRPD) did not sustain her complaint and that the prosecuting attorney declined to bring criminal charges against him." Id. at 794, 797. The Eighth Circuit rejected this argument and concluded that due process violations can be based on mental coercion and do not require physical force. Id.; see also id. (reviewing that the district court found the officer's defense of consent incredible as "[h]e told several versions of what happened on the day of the rape, remained in his clothes throughout, and his excuse for following [the plaintiff] around her house (that he

16

was afraid she had a weapon) was inconsistent with a claim of consensual sex"). Since the district court's finding that the sex was nonconsensual was not clearly erroneous, the Eighth Circuit affirmed. Id.

Finally, this Court looks to other sources, including Black's Law Dictionary and the text of PREA, for guidance, on what constitutes consent in this context. Black's Law Dictionary defines consent as, "[a] voluntary yielding to what another proposes or desires; agreement, approval, or permission regarding some act or purpose, esp. given voluntarily by a competent person; legally effective assent." Consent, Black's Law Dictionary (12th ed. 2024). "Rape," as defined by PREA, encompasses,

> the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person, forcibly or against that person's will; . . . not forcibly or against the person's will, where the victim is incapable of giving consent because of his or her youth or his or her temporary or permanent mental or physical incapacity; or . . . achieved through the exploitation of the fear or threat of physical violence or bodily injury.

34 U.S.C. § 30309(9).

A jury may well agree with Padilla that Haugan consented to the sexual acts that Padilla either performed on Haugan or requested that Haugan perform on him while Haugan was incarcerated and Padilla was a correctional officer. But on summary judgment, this Court must view the facts in the light most favorable to the non-movant, Haugan. EEOC, 679 F.3d at 686.

Padilla encountered Haugan while he was isolated in administrative segregation, in his cell alone for twenty-three hours a day, where SDSP authorities had placed Haugan because of his self-harm behaviors, including a recent manic episode resulting in Haugan shaving his head. Doc. 1 at 4; Doc. 37-1 at 1–3. Padilla was assigned to patrol that floor, where inmates have to be escorted everywhere by an officer. Doc. 37-1 at 4; Doc. 37 ¶ 3. Haugan testified that he had

17

ripped a phone off the wall and given Padilla the wires he planned to keep in his cell when Padilla first became acquainted with Haugan. Doc. 37-1 at 2.

After observing Haugan in this setting for one or two months, Padilla approached Haugan and repeatedly asked Haugan to undress for him; Haugan declined initially but relented because of the repeated requests. Doc. 37-1 at 2–3, 12. Once Haugan had taken off his gown for Padilla in his isolated administrative segregation cell, Padilla "outlined his hard penis in his pants" and said, "[T]his is how you make me feel." Id. at 12. After Padilla initiated this first sexual encounter, while Haugan was still in administrative segregation, Padilla would cuff Haugan's hands and place them on Padilla's penis over his pants. Doc. 37 ¶ 11.

Other sexual encounters following Haugan's housing reassignment out of administrative segregation occurred in isolated areas, such as the laundry room or the staff bathroom without cameras. Doc. 37-1 at 11, 13–15, 18–19, 20–23; Doc. 1 at 4. Haugan's testimony describes these sexual encounters with Padilla as the initiator. See Doc. 37-1 at 11, 14, 16 (noting Padilla "came into the laundry" when no one else was around, took Haugan to "a cage back there where they have clothing," "and proceeded to put his mouth on [Haugan's] penis," and had Haugan "stand on the rack of clothes . . . [s]o he didn't have to get down"); Doc. 37-1 at 17 (testifying Padilla then performed oral sex on Haugan for "30, 40 seconds"); Doc. 1 at 4 (noting when Haugan was assigned to work as a hallway orderly, "Padilla came in the staff bathroom with [Haugan] while [Haugan] was cleaning and had [Haugan] place [Padilla's] penis in [Haugan's] mouth" ); Doc. 37-1 at 20 (testifying that he had "gone on a trash run with [Padilla], and then, [Padilla] had told [Haugan] to go in" the little shower area that is in the back of the staff bathroom" and that "[i]t was [Padilla's] idea to go in there afterwards that time . . . . [r]ight after that trash run"); id. at 22–

18

23 (testifying that Padilla unzipped his pants, pulled his penis out, and had Haugan perform oral sex on him for twenty to thirty seconds before he was about to ejaculate).

Unlike Freitas, where "[t]he record contain[ed] no evidence, other than [the plaintiff's] unsubstantiated assertions, supporting his claim," Haugan has attached to his verified pleading two DOC documents that his report of Padilla's sexual behavior was substantiated. Freitas, 109 F.3d at 1339; Doc. 1-1 at 1, 3. When asked directly during the deposition if the encounters were consensual, Haugan replied, "I don't think it was ever consensual." Doc. 37-1 at 24. Padilla has not established as a matter of law that Haugan and Padilla's "relationship was consensual in the freest sense of the word." See Freitas, 109 F.3d at 1339. Despite Padilla's inclusion of other undisputed facts that might indicate the existence of a consensual relationship—such as Haugan writing love letters, giving Padilla a ring, and telling Padilla he loved him—there remains a genuine dispute of material fact as to whether Haugan consented to all of the sexual encounters while he was incarcerated and Padilla was an SDSP guard. See Doc. 36 at 3 (citing Doc. 37 ¶¶ 4, 5, 7, 9, 16).

## B. Appointment of Counsel

This Court previously denied Haugan's Motion for Appointment of Counsel, Doc. 34, but Haugan's muddled response to Padilla's motion for summary judgment and the existence of a fact issue for trial justify appointment of counsel for Haugan. Matthew Tysdal is willing to accept appointment to assist Haugan in preparing for trial and represent him during trial, subject only to Mr. Tysdal being entitled to fees under 42 U.S.C. § 1988 in the event Plaintiff is the prevailing party in this action, or under the Fifth Amended Plan for Attorney Admission and Pro Bono Fund, § 2.6.

This Court encourages counsel to discuss what, if any, limited discovery by Plaintiff is appropriate to render the case ready for trial and to propose a scheduling order to move this case toward trial.

## IV.    Conclusion

For the foregoing reasons, it is hereby

ORDERED that Defendant's Motion for Summary Judgment, Doc. 35, is denied.  It is further

ORDERED that Matthew Tysdal of the Heidepriem, Purtell, Siegel, & Hinrichs, LLP law firm is appointed as counsel for plaintiff herein for the purpose of assisting Haugan in preparing for and representing him during trial, to serve without compensation except such as he may be entitled to under 42 U.S.C. § 1988, or from the Attorney Admission Fund.

DATED this 2nd day of July, 2026.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

20